## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

```
UNITED STATES OF AMERICA        :
                                :
             v.                 :    Case No. 2:13-CR-48
                                :
WILLIE E. MAYO JR and           :
THOMAS SAVARD,                  :
                                :
             Defendants.        :
                                :
```

### Opinion and Order

Co-Defendants Thomas Savard and Willie E. Mayo, Jr. are charged with knowingly and willfully conspiring to distribute heroin, a Schedule 1 controlled substance, in violation of 21 U.S.C. § 841(a)(1).  Indictment, ECF No. 30.  The charges resulted from the discovery of 83 grams of heroin following a stop and search of Savard's vehicle by state law enforcement. Upon discovery of the heroin, police seized Mayo's cell phones and federal agents later searched the phones without a warrant. Savard filed a motion to suppress evidence obtained from the stop of his motor vehicle, his subsequent interrogation by law enforcement, and the search of his vehicle.  Mayo joined Savard's motion to suppress and additionally filed a motion to suppress any evidence discovered through the warrantless search of his cell phones.  For the reasons stated below, the Court **DENIES** the motion to suppress the evidence seized during initial stop and the search of the vehicle, ECF No. 49.  The Court finds

that the warrantless search of Mayo's cell phone was in violation of the Fourth Amendment, but **DENIES** Mayo's motion to suppress the evidence, ECF No. 50, based on the good faith exception.

## BACKGROUND

### I. Initial Stop of Vehicle

On March 27, 2013, Co-Defendant Savard was driving north on I-89 through Williamstown, Vermont in a Cadillac with Co-Defendant Mayo and two other passengers (both co-defendants in this proceeding, but not parties to these motions). Aff. Sergeant Eric Albright ("Albright Aff.") 1, ECF 53-1. At approximately 9:30 a.m., State Police Sergeant Eric Albright observed the Cadillac encroaching onto the divider line. Albright also observed the Cadillac's driver operating what appeared to be a cell phone at the steering wheel. Due to the vehicle's encroachment and the driver's use of his phone while driving (an apparent violation of Vermont's law against texting while driving), Sergeant Albright put on his emergency lights and directed the vehicle to pull over.

Sergeant Albright approached the Cadillac on the passenger's side and asked for the operator's documents. He observed "several indicators of criminal activity" through the open passenger-side window, including what appeared to be a

small amount of marijuana on the center console and "blunt guts"[1]
in the console and in the lap of a passenger in the back seat.
*Id.*  When Albright asked clarifying questions about the
passengers and their journey, the occupants of the vehicle did
not answer immediately and acted in an evasive manner.  Albright
also noticed that the front seat passenger tried to block his
view into the car.  Based on these observations, Albright was
"highly suspicious of the occupants in [the] vehicle" and
suspected criminal activity.  *Id.* at 2.  He asked Savard to
accompany him to the police cruiser for further questioning;
Savard consented.

## II.  Detention and Interrogation of Savard

Once in the police cruiser, Sergeant Albright immediately
called dispatch for backup. Recorded Motor Vehicle Stop State
Trooper Video/Audio Recording ("Recording") Tr. 5:14, ECF No.
54-1.  He then proceeded to question Savard.  Albright learned
in the course of questioning that Savard and his passengers were
returning from Brooklyn, New York where they had gone out to a
night club for one passenger's birthday.  However, Albright
observed that Savard was dressed in a "tattered, dirty pair of
sweatpants."  Albright Aff. 2.  Savard told Albright that they
had spent the night at the residence of one of the other

---

[1] The term "blunt guts" refers to cigar innards that have been removed
in order to fill the cigar with marijuana.  Suppression Hr'g Tr.
78:16-19, Sept. 12, 2013, ECF No. 63.

passengers but could not identify his last name.  Albright also
asked Savard about the marijuana in the center console; Savard
denied that there was any marijuana in the vehicle.  He
nonetheless admitted that he had a history of drug abuse, and
that he had cooperated with Burlington Police in another drug
investigation.  During the interrogation in the police cruiser,
Albright did not permit Savard access to his cell phone or to
call his lawyer and refused Savard's requests to tie his shoes
and to exit the vehicle to urinate.  He informed Savard that he
was not under arrest and that he would be permitted to exit the
vehicle as soon as another officer arrived at the scene.

Finding that Savard's answers further supported his
suspicions of illegal activity, Albright asked if he could
search the Cadillac.  Savard initially refused.  At that point,
Albright had determined that he had probable cause to seize the
vehicle and apply for a search warrant.  Thus, Albright told
Savard that he would seize the vehicle and apply for a warrant
from a judge to search it if Savard refused to give consent.  He
told Savard that he could allow Albright to search the vehicle
then, or wait for him to seek a warrant.  Savard then consented
to a search.  Albright read a Consent to Search card aloud to
Savard, and Savard signed the card granting Albright consent to

4

search the vehicle.[2]  Backup arrived shortly after Savard signed
the consent form.

## III. Search of Vehicle and Cell Phones

Upon receiving consent to search the car, Albright returned
to the Cadillac where he questioned the three remaining
passengers while the backup officer remained with Savard.  These
passengers were identified as Co-Defendants Mayo, Denzlie
Boston, and Samantha Freda.  Albright directed the three
passengers to exit the vehicle and asked for consent to search
their individual persons.  All three consented and were
searched; no incriminating evidence was found.  Mayo, Boston,
and Freda then waited on the side of the road while Albright
searched the car.  While searching the vehicle, Albright found
"green leafy plant material," additional "blunt guts" on the
rear seat, and what he suspected to be a "marijuana roach."
Albright Aff. 2-3.  He also found a backpack containing three
empty heroin bags and a metal spoon.  Hidden behind the lining
in the trunk, he found a square package wrapped in brown
packaging tape "consistent with how narcotics are packaged in
bulk."  *Id.* at 3.  He opened the package to find smaller wax
paper bags also consistent with packaging for heroin.  The wax

---

[2] At the first suppression hearing, it was ascertained that Savard
actually signed the incorrect line on the Consent to Search card;
however, neither party has raised this as an issue in their briefings.
Suppression Hr'g Tr. 28:10-24, Sept. 12, 2013.

paper bags contained a tan powder that appeared to be heroin.
Suppression Hr'g Tr. 42:13-16, Sept. 12, 2013.  At the time,
Albright estimated that the vehicle contained about a kilo of
heroin.  He proceeded to place all four occupants of the vehicle
under arrest.  Albright seized four cell phones from the vehicle
along with multiple charging cords, including two of Mayo's cell
phones, both smartphones.[3]

The following day, DEA Task Force agents at the State
Police Barracks in Middlesex, Vermont used a Cellebrite machine[4]
to download the contents of Mayo's phones, including the cell
phone number, a contacts list, text messages, call records, and
assorted images.  Def. Mayo's Mot. Suppress & Mot. Join Co-Def.
Savard's Mot. Suppress ("Mayo Mot.") 2-3, ECF No. 50.  Before
the agents examined the phones, they contacted the U.S.
Attorney's Office to confirm that the case would be prosecuted
federally.  It is Vermont state law enforcement's policy to
obtain consent or a warrant for all cell phone searches,
according to the Government's witness.  Suppression Hr'g Tr.

---

[3] According to the Government's witness at the Suppression Hearing,
"smartphone" is not an "exact term" but generally refers to "a phone
that is capable of running an advanced operating system . . . A
smartphone may have a more advanced internet browser, instant
messaging capabilities. It would be able to store more data on the
device, those [sorts] of things."  Suppression Hr'g Tr. 11:4-17, Sept.
30, 2013.

[4] A Cellebrite machine is a device used by law enforcement to extract
data from cell phones and other digital devices.  *Id.* 9:22-15:9.

11:25-12:6, 13:14-20, Sept. 30, 2013.  The federal investigators did not obtain a warrant to search the contents of the phones; instead, they maintain that it was a search incident to lawful arrest and that no warrant was necessary.

## DISCUSSION

The motion to suppress filed by Co-Defendant Savard challenges (1) the initial stop of the vehicle as unsupported by reasonable suspicion; (2) his subsequent detention and interrogation in the police cruiser as unlawful restraint; and (3) his consent to search the vehicle as the involuntary product of police coercion.  Co-Defendant Mayo joins in this motion and additionally challenges the warrantless search of his cell phone after the initial seizure.  The search of the vehicle and the search of the cell phones will be addressed separately below.

## I. Vehicular Stop, Detention, and Search

### A. Initial Stop

The Fourth Amendment establishes a constitutional right against "unreasonable searches and seizures."  U.S. Const. amend. IV.[5]  A police officer "seizes" a vehicle and its

---

[5] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

7

occupants within the meaning of the Fourth Amendment whenever he or she executes a vehicular stop, however brief; therefore, the stop must be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 809–10 (1996).  Traffic stops are presumptively reasonable under the Fourth Amendment where the officer has reason to believe that a traffic infraction has occurred. *Brendlin v. California*, 551 U.S. 249, 249 (2007).  In this case, the initial stop of the vehicle was adequately supported by Albright's observance of two traffic infractions: he saw Savard veering over the lane divider (a violation of Vt. Stat. Ann. Tit. 23, § 1038) and operating what appeared to be a cell phone while driving (a possible violation of Vt. Stat. Ann. Tit. 23, § 1099, Vermont's law against texting while driving). These infractions were sufficient to support the initial stop of the vehicle.  It is immaterial whether Sergeant Albright had additional subjective motivations for making the stop.  *See Wren*, 517 U.S. at 813 (finding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").  Therefore, the initial stop of the vehicle was not an unreasonable seizure in violation of the Fourth Amendment and the evidence derived therefrom is not excluded on these grounds.

### B. Detention in Police Cruiser

Savard's subsequent detention was also reasonable.  A brief stop may be extended for investigatory purposes if the officer

Case 2:13-cr-00048-wks   Document 70   Filed 11/06/13   Page 9 of 40

has "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Swindle*, 407 F.3d 562, 566 (2d. Cir. 2005) (quoting *United States v. Sokolow*, 409 U.S. 1, 7 (1989) (internal quotations omitted)).  This reasonable suspicion must be supported by objective, articulable evidence. *Terry v. Ohio*, 392 U.S. 1, 27 (1968).  By the time Albright detained Savard and invited him back to the police cruiser for questioning, he had viewed illegal substances in the vehicle and observed unusual behavior sufficient to constitute the reasonable suspicion necessary to detain the vehicle and its occupants for further investigation.

The detention did not have an impermissible duration.  To determine whether an investigatory detention has a reasonable duration, the Supreme Court directs courts to "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  In this case, Albright confirmed his suspicions quickly through questioning and obtained Savard's consent to search the vehicle within twenty minutes of the initial stop.  This does not constitute an unreasonable detention.

Nonetheless, Savard challenges the detention and interrogation in Albright's cruiser as unlawful restraint. Restraint that falls short of arrest must be "reasonable."

*United States v. Marin*, 669 F.2d 73, 81 (1982).  This analysis turns on the basis for the stop and the degree of intrusion into the defendant's freedom.  *United States v. Vasquez*, 638 F.2d 507, 520 (1980).  By the time Savard accompanied Albright to the police cruiser, Albright had observed numerous indicia of criminal activity to provide a basis for his continued investigation, such as the suspected marijuana in the center console and the suspicious behavior of the vehicle's occupants. Furthermore, the degree of intrusion into Savard's freedom was not excessive.  Albright invited Savard back to his police cruiser, and Savard accompanied him there consensually.  Savard was not handcuffed and he sat in the front seat of the cruiser. While Savard challenges the fact that Albright did not let him use his phone or leave the cruiser to urinate, the police recording makes clear that Albright told Savard that his detention would only be temporary for purposes of investigation, that he was not under arrest, and that he would be allowed to leave the cruiser as soon as backup arrived, to which Savard replied, "[a]ll right, then, that's reasonable."  Recording Tr. 11:22.  The Court therefore finds that Savard's detention in the police cruiser did not amount to an unreasonable restraint.

### C. *Search of the Vehicle*

Finally, Savard challenges the search of his vehicle as unsupported by voluntary consent.  Generally, a search conducted

10

without a warrant issued upon probable cause is "*per se*
unreasonable" under the Fourth Amendment, subject to a few
"well-delineated exceptions." *United States v. Kon Yu-Leung*,
910 F.2d 33, 41 (2d. Cir. 1990) (quoting *Schneckloth v.
Bustamonte*, 412 U.S. 218, 219 (1973)).  One of these exceptions
is a search conducted with consent.  *Id.*  This consent must be
voluntarily given without duress or coercion.  *See id.*
Voluntariness is determined using a "totality of the
circumstances" test based on "objective reasonableness;" that
is, courts consider what the typical reasonable person would
have understood.  *Id.*  Courts may consider, for example, whether
the person was aware of his right to withhold consent, alongside
factors such as age and intelligence.  *United States v. Drayton*,
536 U.S. 194, 207 (2002).

In this case, Albright made it very clear that Savard had a
choice whether to provide consent to search the vehicle.
Albright read the consent form out loud to Savard, which
included a clear explanation that he would attempt to obtain a
search warrant, and that the "choice was [Savard's]" whether to
allow the search now or wait for the warrant if issued.
Recording Tr. 19:13-19.  The consent form also stated that
Savard understood that he did not have to allow the search and
that no threats were made to elicit the consent.  After reading
the consent form, Albright asked Savard whether he understood

11

the form and encouraged Savard to read it over again before
signing.

In his motion, Savard argues that while he signed a consent
form to search the vehicle, his consent was elicited via
impermissibly coercive behavior by Albright and therefore was
not voluntary.  Def. Mot. Suppress 3.  Savard argues that he was
coerced because he did not feel free to leave during the
questioning in the police cruiser.  *See id.*  However, the Second
Circuit has found consent to be voluntary even where the
defendant is in handcuffs or under arrest.  *See Kon Yu-Leung*,
910 F.2d at 41 (finding voluntary consent even where defendant
was under arrest and handcuffed); *United States v. Crespo*, 834
F.2d 267, 271 (2d. Cir. 1987), *cert. denied*, 485 U.S. 1007
(1988) (same); *United States v. Valencia*, 645 F.2d 1158, 1165
(2d Cir. 1980) (finding voluntary consent where defendant under
arrest).  Therefore, Savard's subjective belief that he was not
free to leave did not render his consent involuntary.

Savard also argues that his consent was involuntary because
after his initial refusal to consent, Albright informed him that
he would seize the car and seek a warrant to search it if Savard
did not consent to the search.  Albright told Savard that he had
probable cause to seize the vehicle and that Savard had the
option to consent to a search then, or to wait for Albright to
attempt to obtain a search warrant.  In response, Savard opted

12

to provide consent for the search.  This does not amount to coercion or involuntariness.  The Second Circuit has made clear that the representation that a warrant will be sought if consent is withheld does not amount to coercion.  *Kon Yu-Leung*, 910 F.2d at 41; *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983).  Based on the totality of the circumstances, Savard's consent was informed and voluntary; therefore the search was valid, and the Court denies the motion to suppress the evidence obtained therefrom.

Furthermore, even if Savard's consent had not been voluntary, Albright was permitted to search the car pursuant to the automobile exception.  The automobile exception is an exception to the warrant requirement that allows police to conduct a warrantless search of a motor vehicle "if probable cause exists to believe the vehicle contains contraband or other evidence of a crime."  *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004); *see also United States v. Ross*, 456 U.S. 798, 809 (1982) (finding that under the automobile exception, "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained").  Probable cause exists where the facts as known to the officer are "sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched."  *Gaskin*, 364

F.3d at 456 (internal quotations omitted).  At this point,
Albright had observed sufficient indicators of illegal activity
to reasonably believe that further evidence of criminal
misconduct would be found in the vehicle.  Thus, Albright had
probable cause to search the vehicle under the automobile
exception.[6]

Because the Court finds that the vehicular stop and
subsequent detention were reasonable and that the vehicular
search was supported by voluntary consent and probable cause,
the Court denies Savard's motion to suppress in full.

## II.  Search of Mayo's Cell Phones

In addition to joining Co-Defendant Savard's motions to
suppress, Co-Defendant Mayo also argues that the warrantless
forensic search of his cell phones violated his Fourth Amendment
rights and that the evidence obtained from the search of the
phones should be suppressed pursuant to the exclusionary rule.
The Government argues that the warrantless search of Mayo's cell
phones was permissible both as a proper search incident to

---

[6] When Albright sought consent from Savard to search the vehicle, he
did not know that the case would ultimately be governed by federal
law.  Vermont state law has a different conception of the automobile
exception that requires a showing of exigent circumstances, *see State
v. Bauder*, 2007 VT 16, 924 A.2d 38, 50 (explaining that the "well-
delineated preconditions" to the automobile exception include (1)
"probable cause to believe that the vehicle contains evidence of
crime" and (2) "exigent circumstances" (quoting *State v. Girouard*, 373
A.2d 836, 840 (Vt. 1977))); thus, Albright was correct to not rely on
the automobile exception on the scene.

arrest and under the automobile exception.  In the alternative, the Government contends that the good faith exception should preclude the application of the exclusionary rule in this case.

### A. Fourth Amendment

In his motion, Mayo argues that the warrantless search of his phone was an unreasonable search in violation of the Fourth Amendment.  In response, the Government contends that the warrantless search of Mayo's cell phones was permitted by the search-incident-to-arrest doctrine and by the automobile exception.

The search-incident-to-arrest doctrine is an exception to the probable cause requirement of the Fourth Amendment.  It allows police officers to conduct warrantless searches of persons they arrest to protect arresting officers and the public and to safeguard evidence that may be destroyed or concealed. *Chimel v. California*, 395 U.S. 752, 773 (1969).  The search-incident-to-arrest doctrine also permits searches of vehicles in which an arrestee recently traveled when it is reasonable to believe evidence of the offense may be found in the vehicle. *Arizona v. Gant*, 556 U.S. 332, 335 (2009).  The doctrine extends to searches of *containers* found on an arrestee's person or automobile automatically incident to arrest, without a case-specific analysis. *United States v. Robinson*, 414 U.S. 218, 235 (1973) (explaining that "[i]t is the fact of the lawful arrest

15

which establishes the authority to search"). In the vehicular context, the search-incident-to-arrest exception extends to "any container" found within the vehicle, defined as "any object capable of holding another object," including "closed or open glove compartments, consoles, . . . luggage, bags, clothing, and the like." *New York v. Belton*, 453 U.S. 454, 460–61 & n.4 (1981).

The Government therefore argues that when the search-incident-to-arrest doctrine is properly triggered, a warrantless forensic search of a cell phone seized pursuant to the doctrine is permissible as a search of a "container" under *Belton*. The Court accepts that the search-incident-to-arrest doctrine is implicated here, as Mayo was arrested shortly after exiting the vehicle and there was reason to believe that further evidence of the offense would be found in the vehicle (indeed, this is where the heroin was discovered). Therefore, the search of the vehicle and its containers were permissible as a search-incident-to-arrest under *Gant*. However, it does not necessarily follow that the subsequent warrantless search of Mayo's cell phones was permitted as a container search under *Belton*. Many courts have addressed whether cell phones are containers for purposes of the search-incident-to-arrest doctrine; while the

majority have found cell phones to qualify as containers, the

issue remains unsettled.[7]

---

[7] Neither the Supreme Court nor the Second Circuit has addressed this issue.  However, several circuit courts and district courts have permitted warrantless searches of cell phones incident to arrest. *See, e.g., United States v. Murphy,* 552 F.3d 405, 411 (4th Cir. 2009) (finding warrantless cell phone search permitted pursuant to search incident to arrest); *United States v. Finley,* 477 F.3d 250, 260 (5th Cir. 2007) (denying motion to suppress call records and text messages retrieved from cell phone searched incident to arrest by analogizing to container search); *Silvan W. v. Briggs,* 309 F. App'x 216, 225 (10th Cir. 2009) (unpublished) (relying on *Finley* to find that "permissible scope of search incident to arrest includes the contents of a cell phone found on the arrestee's person"); *United States v. Stringer*, No. 10-05038-01-CR-SW-GAF, 2011 WL 3847026, at *8 (W.D. Mo. July 20, 2011) ("[T]he majority position appears to favor a holding that cell phones and cameras should be viewed as containers for purposes of Fourth Amendment law."); *United States v. Valdez,* No. 06 CR 336, 2008 WL 360548, at *2-4 (E.D. Wis. Feb 8, 2008) (upholding warrantless search of cell phone's address book and call history incident to arrest); *United States v. Deans*, 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008) (relying on *Finley* to uphold search of electronic data on lawfully seized cell phone).  *But see United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013) (holding that the search-incident-to-arrest doctrine "does not authorize the warrantless search of data on a cell phone seized from an arrestee's person"); *United States v. Aispuro*, CRIM A 13-10036-01, 2013 WL 3820017, at *14 (D. Kan. July 24, 2013) (finding warrantless search of text messages and photos on cell phone to be unreasonable absent exigent circumstances); *United States v. Schmidt,* No. 12 CR 6018, 2012 WL 3686645, at *5 (W.D.N.Y. July 9, 2012); report and recommendation adopted, 2012 WL 3686176 (W.D.N.Y. Aug. 24, 2012) (finding that the law in this area is "far from well settled"); *United States v. Quintana,* 594 F. Supp. 2d 1291, 1298-1301 (M.D. Fla. 2009) (concluding search of defendant's cell phone was not justified as search incident to arrest); *United States v. McGhee,* No. 09 CR 31, 2009 WL 2424104, at *3-4 (D. Neb. July 21, 2009) (finding that "officers were not justified in conducting a warrantless search of [defendant's] cell phone incident to [defendant's] arrest"); *United States v. Wall,* 2008 WL 5381412, at *3-4 (S.D. Fla. Dec.22, 2008) aff'd 343 F. App'x 564 (11th Cir. Sept. 4, 2009) (declining to adopt *Finley* and instead finding that search of cell phone could not be justified as a search incident to lawful arrest); *United States v. Park,* No. CR 05-375, 2007 WL 1521573, at *9 (N.D. Cal. May 23, 2007) (refusing to "authorize the warrantless search of the contents of a cellular phone—and to effectively permit the warrantless search of a wide range of electronic storage devices—as a 'search incident to arrest'").

The container rule comes from the Supreme Court's decision in *Robinson*, wherein the Court upheld the constitutionality of a warrantless search of a cigarette package taken from an arrestee's person incident to arrest.  414 U.S. at 225.  This holding was subsequently found to apply to all containers open or closed.  *See Belton*, 453 U.S. at 461.  Since then, several courts have applied the container doctrine to allow warrantless searches of cell phones incident to arrest.  *See, e.g., Finley*, 477 F.3d at 260 (finding warrantless search of cell phone proper by analogizing to container); *Briggs*, 309 F. App'x at 225 (relying on *Finley* to find the same).  In *Finley*, the most-cited circuit court decision regarding this issue, the Fifth Circuit allowed a warrantless search of a cell phone's call records and text messages incident to arrest, deciding, without significant discussion, that this plainly fell within the container doctrine.  477 F.3d at 260.  The Government similarly argues that because cell phones often contain similar objects and information as the "containers" permitted under *Belton* (such as "photos, calendars, phone numbers, and receipts"), cell phones should qualify as containers subject to the same search-incident-to-arrest exception to the warrant requirement.  Gov't Opp'n Mot. Suppress 6, ECF No. 53.  However, "the fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the

18

Fourth Amendment." *Kyllo v. United States*, 533 U.S. 27, 35 n.2
(2001).  Cell phone technology has progressed dramatically even
in the six years since *Finley* was decided,[8] and the rationale
underlying the container doctrine has not kept pace with these
developments.  As a result, *Finley*'s finding that a cell phone
easily fits within the container doctrine is no longer
compelling.

The physical containers at issue in *Robinson* and *Belton*,
and, indeed, even the cell phones in *Finley*, could not begin to
approximate the *amount* of information that may be stored on a
cell phone today.[9]  The Government states again and again in its
briefings and at the hearings that the only difference between
cell phones and conventional containers is that cell phones are
"capable of storing large amounts of information."  Gov't Post-
Hr'g Mem. Mot. Suppress 13.  The Government posits that this
capability does not justify any differentiation between cell
phones and traditional containers, but, in the Court's view,
this is precisely the factor that makes all the difference.  The

[8] For example, the first iPhone was not released until July 2007, six
months after the Fifth Circuit decided *Finley*.  *See* Adam M.
Gershowitz*, The iPhone Meets the Fourth Amendment*, 56 UCLA L. Rev. 27,
29 (2008).

[9] The Government downloaded 1514 images from just one of Mayo's cell
phones.  Suppression Hr'g Tr. 39:21-22, Sept. 30, 2013.  Each image
included a time stamp and the latitude, longitude, and altitude at
which the photograph was taken.  *Id*. 41:19-42:13.  This is just one
example of the amount and type of information that may be found on a
modern cell phone.

container analogy fundamentally fails to address the magnitude
of modern cell phone storage capacity.  Furthermore, it fails to
consider the fact that many modern smartphones can access the
Internet, opening up limitless additional storage.  Because of
these capabilities, modern cell phones can no longer fit
comfortably within the Supreme Court's original conception of a
"container."  As the Seventh Circuit has remarked, "a modern
cell phone is . . . not just another purse or address book."
*United States v. Flores-Lopez*, 670 F.3d 803, 805 (7th Cir. 2012)
(allowing warrantless search of cell phone to obtain owner's
phone number, but shelving the question of a more invasive
search "for another day"); *see also* Gershowitz*, supra*, at 43
(noting that smartphones allow access to information that an
arrestee would be incapable of carrying in his pocket); Charles
E. MacLean, *But, Your Honor, a Cell Phone is Not a Cigarette
Pack: An Immodest Call for a Return to the Chimel Justifications
for Cell Phone Memory Searches Incident to Lawful Arrest*, 6 Fed.
Cts. L. Rev. 37, 42 (2012) (explaining that a modern iPhone has
enough storage to hold about "four million pages of Microsoft
Word documents").

Several courts have recognized the storage capacity of
modern cell phones as a basis for refusing to permit a
warrantless search.  Most notably, the First Circuit recently
determined that the search-incident-to-arrest doctrine "does not

20

authorize the warrantless search of data on a cell phone seized from an arrestee's person." *Wurie*, 728 F.3d at 13.  A significant concern underlying the First Circuit's decision was the amount of information that would be accessible via a cell phone search.  *Id.* at 9 (noting that individuals today "store much more personal information on their cell phones than could ever fit in a wallet, address book, briefcase, or any of the other traditional containers that the government has invoked"); *see also Park*, 2007 WL 1521573, at *9 (suppressing evidence from a warrantless search of defendant's cell phone and analogizing modern cell phones to computers); *State v. Smith,* 920 N.E.2d 949, 954 (Ohio 2009) ("Even the more basic models of modern cell phones are capable of storing a wealth of digitized information wholly unlike any physical object found within a closed container. We thus hold that a cell phone is not a closed container for purposes of a Fourth Amendment analysis.").

     The Government, in its continued attempt to downplay the quantity of information available on a cell phone, argues that the amount of data available should not matter because exceptions to the warrant requirement have been applied to large vehicles and motor homes.  Gov't Post-Hr'g Mem. 13 (citing *California v. Carney*, 471 U.S. 386, 388-89 (1985) (applying the automobile exception to a motor home); *United States v. Gagnon*, 373 F.3d 230, 240 (2d Cir. 2004) (tractor-trailer); *United*

*States v. Cruz*, 834 F.2d 47 (2d Cir. 1987) (tractor-trailer truck)).  This analogy demonstrates the Government's misconstruction of the problem: the issue is not how *large* the container is, but that in the context of cell phones there is no limit to what the purported "container" may contain.  *See Schlossberg v. Solesbee*, 844 F. Supp. 2d 1165, 1169 (D. Or. 2012) (finding that warrantless search of a digital camera violated the Fourth Amendment in part because "the storage capability of an electronic device is not limited by physical size as a container is").  Because modern cell phones can connect to the Internet, their storage capacity is nearly infinite.  A tractor-trailer may be much larger than a sedan, but it still has tangible confines.  A cell phone, by contrast, has no defined boundaries.  Thus, allowing warrantless searches of cell phones pursuant to the search-incident-to-arrest exception would provide law enforcement with a giant exception to the warrant requirement without any limiting principles.

Consider, for purposes of illustration, C.S. Lewis's famous wardrobe.  *See* C.S. Lewis, *The Lion, the Witch, and the Wardrobe* (1950).  There is no question that the search-incident-to-arrest doctrine extends to a conventional wardrobe (in the unlikely event that one is found in a vehicle or on an arrestee).  While this would be a search much more intrusive than *Robinson*'s cigarette pack, it still fits within the container doctrine

22

because it has easily discernible limits: the container is large, but it is contained.  Contrast this with the eponymous cabinetry in *The Lion, the Witch, and the Wardrobe*.  Because the magical wardrobe is also a container, the Government would argue that it also fits within *Robinson* and *Belton*.  However, this particular wardrobe also serves a second function.  It opens up to another world, and because of this, it ceases to be merely a container—it is also a portal.  Today's cell phones, with their capacity to reach the Internet, the cloud, and to store millions of documents and photographs, can no longer analogize to a run-of-the-mill wardrobe.  Instead, they are also a portal: a portal to the vast cosmos of the Internet.  *See* Matthew E. Orso, *Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence*, 50 Santa Clara L. Rev. 183, 211 (2010) (noting that warrantless cell phone searches would give law enforcement access to a "virtual warehouse").  If the container rule were to apply to such a portal, a container search of Lewis's wardrobe would extend to all of Narnia.  But where a physical object is a portal to another world, there is a critical difference between a search of the object and a search of the worlds "contained" within the object.

Thus, it is simply inappropriate to analogize cell phones to cigarette packs, purses, and address books; the more apt comparison is to computers.  *See Flores-Lopez*, 670 F.3d at 805

(noting that "a modern cell phone *is* a computer").  Courts have
consistently found analogies between computers and conventional
containers to be problematic.[10]  For example, the Tenth Circuit
found that "analogies to closed containers or file cabinets may
lead courts to 'oversimplify a complex area of Fourth Amendment
doctrines and ignore the realities of massive modern computer
storage.'"  *United States v. Carey,* 172 F.3d 1268, 1275 (10th
Cir. 1999) (quoting Raphael Winick, *Searches and Seizures of
Computers and Computer Data,* 8 Harv. J.L. & Tech. 75, 104
(1994)); *see also United States v. Lucas*, 640 F.3d 168, 178 (6th
Cir. 2011) (finding that "analogizing computers to other
physical objects when applying Fourth Amendment law is not an
exact fit because computers hold so much personal and sensitive
information touching on many private aspects of life" but
allowing search of computer on consent grounds); *United States
v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1175 (9th
Cir. 2010) (en banc) (discussing the differences between
physical and electronic storage); *United States v. Burgess*, 576

---

[10] The Court has not been able to find any cases applying the search-
incident-to-arrest exception or the automobile exception to a
warrantless search of a computer.  Legal scholars have noted that
there is a "paucity of precedent regarding the search of laptops or
other computers incident to arrest" and posited that this is because
"even police do not believe a search of computer incident to arrest is
permissible, seeking instead a warrant for the search of computers."
Orso, *supra*, at 215; *see also* Margaret M. Lawton, *Warrantless Searches
and Smartphones: Privacy in the Palm of Your Hand?*, 16 U. D.C. L. Rev.
89, 104 (2012) (making same observation).

F.3d 1078, 1088 (10th Cir. 2009) (noting that the difference between a file cabinet and a computer "might lie in the sheer range and volume of personal information that a computer may contain").

The Government alternately seeks to justify the warrantless cell phone search as a container search under the automobile exception (as distinct from the vehicular prong of the search-incident-to-arrest doctrine). Gov't Opp'n 7-8. However, the container rule under the automobile exception does not compel a different conclusion. The automobile exception allows law enforcement to search a vehicle and its contents that may conceal the objects of a search without a warrant so long as there is probable cause. *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999) (quoting *Ross*, 456 U.S. at 823) (finding that the automobile exception "justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search"). Several district courts have found that this exception extends to the warrantless search of a cell phone found in a vehicle searched with probable cause, so long as there is probable cause to believe the phone contained evidence of a crime. *See, e.g.*, *United States v. Cole*, 1:09-CR-0412-ODE-RGV, 2010 WL 3210963 at *17-18 (N.D. Ga. Aug. 11, 2010); *United States v. Garcia-Aleman,* No. 1:10-CR-29, 2010 WL 2635071, at *12 (E.D. Tex. June 9, 2010); *United States v. James,* No. 1:06CR134

CDP, 2008 WL 1925032, at *4 (E.D. Mo. Apr.29, 2008), *aff'd in part sub nom.*, *United States v. Dinwiddie*, 618 F.3d 821 (8th Cir. 2010).

These courts, like the courts in the search-incident-to-arrest context, all found that the searches were constitutional by analogizing cell phone searches to container searches.  *See Cole*, 2010 WL 3210963, at *17-18 (finding that defendant's cell phone was a "container" for purposes of the automobile exception, thereby permitting a "brief warrantless search"); *Garcia-Aleman*, 2010 WL 2635071, at *12 (finding that "the automobile exception gave law enforcement officers latitude to search . . . cell phones like it would allow the search of other closed containers" in a vehicle); *James*, 2008 WL 1925032, at *4 ("Because probable cause existed to believe that evidence of a crime would be found in the cell phone call records and address book, the automobile exception allows the search of the cell phone just as it allows a search of other closed containers found in vehicles.").  Because the Court finds that this container analogy is no longer workable, the automobile exception does not require a different analysis. Instead, cell phones seized pursuant to the automobile exception, like those under the search-incident-to-arrest doctrine, are also properly analogized to computers, not containers.

Not only have cell phones outgrown the original conception of a conventional container under the search-incident-to-arrest and automobile exceptions, but warrantless cell phone searches also can no longer be justified by the rationales underlying these exceptions.  In *Wurie*, the First Circuit found that the Government could not demonstrate that warrantless cell phone searches are "ever necessary to protect arresting officers or preserve destructible evidence." *Wurie*, 728 F.3d at 13 (citing *Chimel,* 395 U.S. at 763).  Many courts to address this issue have reached a similar conclusion. *See, e.g.*, *Aispuro*, 2013 WL 3820017, at *14 ("Absent a showing of exigent circumstances . . . it was unreasonable to search through the text messages and photos on the cell phone without first obtaining a warrant."); *Schlossberg*, 844 F. Supp. 2d at 1169 (finding warrantless searches of electronic devices not reasonable incident to arrest absent safety, evidentiary, or exigency concerns); *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009) (stating, in dictum, that a warrantless cell phone search that "had nothing to do with officer safety or the preservation of evidence" should be suppressed); *Wall*, 2008 WL 5381412 at *4 (finding that warrantless search of cell phone was unsupported by need for officer safety or evidence preservation).  When a search does not serve these purposes, it becomes a "general evidence-gathering search" not subject to any limiting

27

principle.  The Fourth Amendment permits such searches "only pursuant to a lawful warrant." *Wurie*, 728 F.3d at 10; *see also Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring) ("[I]n the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling.").

In *Wurie*, the First Circuit found that a forensic search of cell phone data equates to a "general evidence-gathering search" and therefore requires a warrant.  728 F.3d at 13 (explaining that "warrantless cell phone data searches strike us as a convenient way for the police to obtain information related to a defendant's crime of arrest—or other, as yet undiscovered crimes—without having to secure a warrant"); *see also United States v. DiMarco*, No. 12 CR 205 RPP, 2013 WL 444764, at *12 (S.D.N.Y. Feb. 5, 2013) (finding a cell phone search unlawful under the search-incident-to-arrest exception in part because the search was "exploratory and rummaging in nature").  The court further found that nothing in the Supreme Court's search-incident-to-arrest jurisprudence "sanctions such a 'general evidence-gathering search.'" *Wurie*, 728 F.3d at 13 (quoting *Thornton*, 541 U.S. at 632 (Scalia, J., concurring)).  Based on these concerns, the First Circuit adopted a bright-line rule that any warrantless search of a cell phone seized from a person

incident to arrest would be categorically unconstitutional.  *Id*. at 12.

*Wurie*'s concern with "general evidence-gathering" is plainly applicable to this case.  The search of Mayo's cell phones was very invasive and performed without any limitations on law enforcement.  Furthermore, it was not justified by the rationales underlying the search-incident-to-arrest and automobile exception doctrines.  In fact, the Government has not demonstrated that such intrusive warrantless searches are ever necessary absent exigent circumstances.  The search-incident-to-arrest exception "derives from interests in officer safety and evidence preservation."  *Gant*, 556 U.S. at 338 (citing *Robinson*, 414 U.S. at 230–234; *Chimel*, 395 U.S. at 763).  Similarly, the automobile exception is rooted in the need to preserve evidence. *See Ross*, 456 U.S. at 806-07 (noting that in the automobile context, "immediate intrusion is necessary if police officers are to secure . . . illicit substance[s]").  Obviously, officer safety considerations are not implicated here.  However, the Government has not demonstrated that such searches are necessary for evidence preservation either.

In the past, courts have allowed warrantless cell phone searches because they found it necessary to allow police officers to search a cell phone based on the need to preserve evidence.  *See, e.g.*, *Murphy*, 552 F.3d at 411 (noting that the

need to preserve evidence may justify a warrantless cell phone search); *Finley*, 477 F.3d at 260 (warrantless cell phone search justified by need to "preserve [evidence] for use at trial"). However, once law enforcement has seized and secured a cell phone, the risks regarding evidence preservation diminish. While courts have voiced concerns about the danger that internal data could be remotely erased, *see Flores-Lopez*, 670 F.3d at 807-08, there are simple methods available to protect a seized cell phone from remote modification.  For example, in Vermont, it is state law enforcement's practice to turn seized smartphones to "airplane" mode to disconnect them from outside interference, or to place them in a device[11] that protects the phone from outside disruption.  Suppression Hr'g Tr. 11:25-12:6, 13:14-20, Sept. 30, 2013.  Thus, the Government has not shown that evidence preservation considerations justify the warrantless search of a seized cell phone.

Moreover, the Government has not demonstrated that it would be an undue hardship for federal law enforcement to obtain a warrant before performing forensic analysis on a cell phone. Indeed, this is already standard operating procedure for Vermont state law enforcement.  *See* Suppression Hr'g Tr. 38:10-15, Sept. 30, 2013 (Government's witness confirming that state law

---

[11] For example, a Faraday enclosure is a container that protects cellular phones from external disruption, and may be purchased for as little as $30.  MacLean, *supra*, at 42.

enforcement would not search cell phone without warrant or
formal consent of owner).  The dearth of considerations
necessitating exception cannot justify the serious invasion of
privacy inherent in a warrantless cell phone search.  Thus, the
Court finds that Mayo's Fourth Amendment rights were violated
when law enforcement searched his phone without a warrant.

Even *Flores-Lopez*, in which the Seventh Circuit recently
*allowed* a warrantless cell phone search incident to arrest,
provides support for this conclusion.  *See Flores-Lopez*, 670
F.3d at 803 (allowing a warrantless cell phone search incident
to arrest where it found the degree of invasiveness of the
search was outweighed by the need for the invasion).  In *Flores-
Lopez*, the Seventh Circuit permitted a warrantless cell phone
search where police officers seized several cell phones from the
defendant's truck upon arrest.  At the scene of the arrest, an
officer searched each cell phone for its telephone number, which
the government then used to subpoena the call histories from the
cell service provider.  670 F.3d at 809.  The court allowed the
search even where the risk to police officers or evidence was
negligible because the search was "no more invasive than . . . a
frisk, or the search of a conventional container."  *Id.* (citing
*Robinson*, 414 U.S. at 235).  However, the Seventh Circuit also
noted that where a search exceeds this level of invasiveness
(i.e., rises above a simple frisk to the equivalent of a strip

search), the risk to the officers' safety or preservation of evidence must be greater to justify the search.[12]

In this case, the police downloaded significant amounts of data from Mayo's phone–including a contacts list, text messages, call records, and images–and proceeded to view that data without obtaining a warrant.  Mayo Mot. 3.  While looking in a cell phone for its number simply to subpoena call records might analogize to a frisk or conventional container search, examining all of a phone's data approaches or even exceeds the Seventh Circuit's "strip search" analogy, thereby requiring far greater risk to safety or evidence preservation to justify the search than existed in this case.  While the Seventh Circuit permitted the search in *Flores-Lopez*, its reasoning actually supports the Court's finding here: today's cell phones provide information far exceeding what is available via a simple frisk or conventional container search, and a forensic search of a modern cell phone is typically going to be far more intrusive than the simple search at issue in *Flores-Lopez*.  Therefore, the considerations in favor of the warrantless search must be

---

[12] The dissent in *Wurie* seems to strike a similar position.  While it declines to join the majority in creating a bright-line rule, it appears to acknowledge that a more serious warrantless search might be constitutionally unacceptable.  *See Wurie*, 728 F.3d at 18 (Howard, J., dissenting) (noting that the police "did not browse through voluminous data in search of general evidence" or search "applications containing particularly sensitive information" but that such "scenarios may one day form the basis of [the court's] reasoning in another case").

correspondingly more compelling to justify such an intrusion.
The Government has not demonstrated that such justifications
exist; thus, even under the reasoning in *Flores-Lopez*, the DEA's
warrantless search of Mayo's cell phones was unconstitutional.

For the reasons outlined above, the Court finds that the
search of Mayo's cell phones was unsupported by the search-
incident-to-arrest doctrine or the automobile exception and
therefore constituted an unreasonable search under the Fourth
Amendment.  However, the Court also finds that the conclusions
reached through this analysis have implications reaching far
beyond the facts of the instant case.  The landscape of cell
phone technology has changed so vastly and so rapidly that much
of the precedent on this issue has been rendered illogical.  The
Court therefore finds it prudent to lay out guidelines for law
enforcement going forward.

The Court sees two plausible options before it: the Seventh
Circuit's ad hoc approach based on a case-by-case weighing of
justifications and reasonableness, and the bright-line rule
employed by the First Circuit in *Wurie*.  The problem with the
Seventh Circuit's approach is that it provides too little
guidance to law enforcement.  While law enforcement is often
well-equipped to make on-the-ground decisions pertaining to
probable cause, this amount of discretion and uncertainty
presents particular problems in the context of modern cell

phones, which as this opinion has explained, can provide near-limitless access to information.

In contrast to the Seventh Circuit, the First Circuit chose to adopt a bright-line rule that any warrantless search of a cell phone seized from a person incident to arrest would be categorically unconstitutional. *See Wurie*, 728 F.3d at 13. The First Circuit declined to make a case-specific holding given "the Supreme Court's insistence on bright-line rules in the Fourth Amendment context." *Id.* at 12 (citing *Thornton*, 541 U.S. at 623); *see also United States v. Cruz-Rojas*, 104 F.3d 354 (2d Cir. 1996) (noting that the Supreme Court chose to create a bright-line rule in *Belton*). The First Circuit noted that allowing some cell phone searches but not others would create the "inherently subjective and highly fact specific" rules that the Supreme Court seeks to avoid. *Id.* (quoting *Thornton*, 541 U.S. at 623). This Court finds the First Circuit's approach superior to that adopted by the Seventh Circuit because

> it is necessary for all warrantless cell phone data searches to be governed by the same rule. A rule based on particular instances in which the police do not take full advantage of the unlimited potential presented by cell phone data searches would prove impotent in those cases in which they choose to exploit that potential.

*Wurie*, 728 F.3d at 12. For these reasons, the Court chooses to adopt a bright-line rule here: cell phones properly seized pursuant to the search-incident-to-arrest exception or the

34

automobile exception cannot be searched without a warrant.
Case-by-case analysis is not appropriate in this context, and
the Government has not demonstrated any reason that such a
warrant requirement would be unduly burdensome.  As a result,
the Court hereby holds that law enforcement must obtain a
warrant before performing such searches in the future.

This finding has no bearing on whether the *seizure* of cell
phones incident to arrest or under the automobile exception is
constitutional.  As the Tenth Circuit noted in *Burgess*, "there
is substantial support for the notion a warrantless seizure is
valid but a warrantless search is not."  576 F.3d at 1089.  For
example,

> [I]f there is probable cause to believe [an object]
> contains contraband, the owner's possessory interest
> in the container must yield to society's interest in
> making sure that the contraband does not vanish during
> the time it would take to obtain a warrant. The item
> may be seized temporarily. It does not follow,
> however, that the container may be opened on the spot.
> Once the container is in custody, there is no risk
> that evidence will be destroyed. Some inconvenience to
> the officer is entailed by requiring him to obtain a
> warrant before opening the container, but that alone
> does not excuse the duty to go before a neutral
> magistrate.

*Texas v. Brown,* 460 U.S. 730, 749–50 (1983) (plurality)
(Stevens, J., concurring).  Thus, the *seizure* of Mayo's cell
phones was proper, as the search of the vehicle was performed
with probable cause pursuant to the automobile exception and as
a search incident to a lawful arrest.  Furthermore, this seizure

was justified by the evidence preservation rationale of these doctrines.  However, this is distinct from the *search* of the seized cell phones; while the seizure was permissible, the Fourth Amendment requires that law enforcement obtain a warrant before performing a forensic search of lawfully seized cell phones.

### B. Exclusionary Rule

The Court therefore finds that Mayo's Fourth Amendment rights were violated when the police officers searched his phone without a warrant.  However, this finding does not mean that the evidence derived from the unconstitutional cell phone search is automatically excluded in this case.  The Fourth Amendment "says nothing about suppressing evidence obtained in violation of this command."  *Davis v. United States*, 131 S.Ct. 2419, 2426 (2011).  The Supreme Court created the exclusionary rule, which excludes evidence obtained in violation of the Fourth Amendment, as a "prudential" doctrine.  *Id.* (quoting *Penn. Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 363 (1998)).  The purpose of the exclusionary rule under the Fourth Amendment is to deter police misconduct by disallowing the introduction of evidence obtained via unconstitutional searches and seizures.  When the police act with a "reasonable good-faith belief" that their conduct is lawful, the exclusionary rule no longer serves this purpose. *See United States v. Leon*, 468 U.S. 897, 909, 919 (1984)

(finding that in the good faith context, the "deterrence rationale [of the exclusionary rule] loses much of its force"). As a result, the Supreme Court has applied a "good faith" exception in several circumstances, such as where the police conduct a search in reasonable reliance on a warrant later found to be invalid or on a statute that is subsequently overturned. *See Davis*, 131 S.Ct. at 2428.   In *Davis*, the Court applied the good faith exception to a search conducted in objectively reasonable reliance on binding appellate precedent.   *Id*.

Ultimately, the decision to apply the good faith exception turns on whether the police acted under a *reasonable belief* that their actions were compliant with the law.   *See Leon*, 468 U.S. at 909 (quoting *Ill. v. Gates*, 462 U.S. 213, 255 (1983) (White, J., concurring)) (finding that exclusionary rule permits evidence obtained based on a "reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment"). As of March 2013, neither the Supreme Court nor the Second Circuit had addressed the issue of warrantless searches of cell phones incident to arrest or pursuant to the automobile exception.   *See DiMarco*, 2013 WL 444764 at *6 (surveying the existing precedent and noting the lack thereof in the Supreme Court and Second Circuit).   However, all of the circuits to address the issue had permitted such searches.   The First Circuit's *Wurie* opinion was issued after the events of this case

37

transpired.  The Court recognizes that law enforcement in this case was acting pursuant to reasonable reading of Supreme Court precedent and a general consensus in other circuits.  Thus, in this context, the behavior of law enforcement was reasonable. *See United States v. Rose*, 914 F. Supp. 2d 15, 23 (D. Mass. 2012) (applying *Davis* where no binding appellate precedent existed but there was a lower court consensus and a "common-sense reading of Supreme Court doctrine").  As a result, the Court finds that while Mayo's Fourth Amendment rights were violated, the good faith exception is properly applied in this case and the exclusionary rule does not apply to the evidence derived from the cell phone search.

Mayo argues that the Court should refuse to apply the good faith exception based on a recent Third Circuit decision that adopted a limited reading of *Davis* to find that the good faith exception only applies where binding appellate precedent "specifically authorizes" a police practice.  *United States v. Katzin*, 2013 WL 5716367, at *15 (3d Cir. Oct. 22, 2013).  In *Katzin*, the Third Circuit relied substantially on language in Justice Sotomayor's concurring opinion in *Davis* noting that the Supreme Court's decision did not "present the markedly different question whether the exclusionary rule applies where the law governing the constitutionality of a particular search is unsettled."  *Davis*, 131 S.Ct. at 2435 (Sotomayor, J.,

concurring).  Citing this language, the Third Circuit declined to apply the good faith exception where police relied on out-of-circuit precedent.  *Katzin*, 2013 WL 5716367, at *16-17.  Mayo cites *Katzin* to argue that the good faith exception should not apply in this case because there is no on-point authority from the Supreme Court or the Second Circuit.

In *Katzin*, however, there was a significant circuit split on the issue in question.  *See* 2013 WL 5716367, at *17.  Thus, law enforcement would not have been able to *reasonably* rely on out-of-circuit precedent, as there was no consensus.  In other words, the law could easily be characterized as the type of "unsettled" law contemplated by Justice Sotomayor's concurrence. In this case, by contrast, there was no circuit split as of March 2013; all of the circuits to address the issue had permitted such searches.  While there was no binding Second Circuit authority, law enforcement acted reasonably in reliance on a general out-of-circuit consensus.  Because *Katzin* is distinguishable from this case, the Court finds that application of the good faith exception remains appropriate.

### CONCLUSION

For the reasons stated above, the motion to suppress the evidence obtained from the stop of the vehicle, Co-Defendant Savard's detention, and the search of the vehicle is denied. The Court also finds that warrantless searches of cell phones

seized incident to arrest or under the automobile exception
violate the Fourth Amendment, and hereby holds that all future
searches must be conducted pursuant to a warrant.  However, the
Court applies the good faith exception to permit the unlawfully
obtained evidence in this instance.


        Dated at Burlington, in the District of Vermont, this 6th
day of November, 2013.

                                /s/ William K. Sessions III
                                William K. Sessions III
                                United States District Judge